## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAUREN  KINGSMORE,

      Plaintiff,

      v.

DISTRICT OF COLUMBIA,

      Defendant.

Civil Action No. 03-1130 (PLF/JMF)

## REPORT AND RECOMMENDATION

This case was referred to me for full case management, including a Report and

Recommendation on the pending cross motions for summary judgment.  For the reasons stated

below, I recommend that Plaintiffs' Motion for Summary Judgment be granted and Defendants'

Opposition to Plaintiffs' Motion for Summary Judgment and Defendants' Cross Motion for

Summary Judgment denied.

## INTRODUCTION

This case involves the education of a child we will call "H.K." who was born on June 23,

1994 and who is now ten years old.  H.K.'s mother and father divorced and her mother moved

with H.K. from Anne Arundel County to the District of Columbia.  H.K. attended the Lab

School, a school that, according to the record in this case, serves learning disabled children

exclusively. Transcript of Hearing held on April 24, 2003 ("Tr.") at 43.  In October 2002, H.K.'s

mother spoke to the principal of Horace Mann Elementary School who explained to her how

H.K. should be registered as a "non-attending" student. Tr. at 50.  Ultimately, a District of

Columbia Public Schools ("DCPS") evaluation team, with the participation of H.K.'s mother,

concluded that H.K. was a child who had a learning disability and that she was entitled to the services provided to such children by the Individuals with Disablities Education Act ("IDEA"), 20 U.S.C. §1400, *et seq*.[1]  The team created an Individual Education Plan ("IEP") for her and concluded that Horace Mann was an appropriate placement for her.

H.K.'s mother challenged that determination and secured a hearing before a hearing officer.  Unfortunately, the device used to record the proceedings during the hearing either was malfunctioning or was not used correctly.  In fact, H.K.'s mother's counsel has counted 100 instances in the 119-page transcript where the person transcribing the tape has noted that whatever was said is inaudible.  More significantly, the entire cross-examination of one of the two DCPS witnesses was not captured and therefore not transcribed.

For the reasons I will now state, I believe that the failure to provide H.K.'s mother with the verbatim transcription of the hearing that the IDEA requires deprived her of an entitlement guaranteed by the statute and that this deprivation compels the conclusion that H.K. has been denied the free appropriate public education to which she is due.

## DISCUSSION

I.    The Missing Portions of the Hearing Transcript

        A.    Testimony of the DCPS Witnesses

DCPS called two witnesses at the hearing, Harriet Lorinksy Kuhn and a woman identified in the transcript as "Mrs. Ford."  Ms. Kuhn has been a DCPS school psychologist for twelve years and is assigned to five schools, one of which is Horace Mann.  Mrs. Ford is the principal of

---

[1] All references to the United States Code are to the electronic versions that appear in Westlaw or Lexis.

that school.

Ms. Kuhn testified that she developed from what she described as "outside reports," a psycho-educational report to evaluate H.K.'s eligibility for services for the learning disabled and to assist in her placement. Tr. at 32.  She concluded that H.K. would benefit from part-time special education services in reading.  Specifically, Ms. Kuhn stated that H.K. should sit close to the teacher, who, in turn, should repeat visually presented directions as needed, making sure that H.K. grasped the concepts being presented.  Ms. Kuhn also stated that Horace Mann should monitor H.K. carefully to increase her competence for reading and writing and that she would benefit from weekly group counseling to boost her self-esteem and self-confidence.  Finally, Ms. Kuhn recommended that a speech and language review be conducted in order to determine her eligibility for additional speech and language services. Tr. at 32-33.

In Ms. Kuhn's view, H.K. has a mild learning disability, compounded by emotional issues. Tr. at 40.  Ms. Kuhn also concluded that H.K.'s test scores are where they should be or close to it and that her needs would be met at Horace Mann, where she would reap the benefits of spending most of her time with non-learning disabled peers.  Tr. at 41-42.  In Ms. Kuhn's view, the Lab School, with its full-time program for severely learning disabled children, including a one-to-one adult-child ratio, was more than H.K. needed. Tr. at 43-44.

Mrs. Ford, the principal of Horace Mann, testified that special education was needed by only 6% of the student population at that school. Tr. at 48.  She further explained that the learning disabled children are "mainstreamed" (*i.e.* integrated with the other children) but that a special education teacher worked with the learning disabled children either in their regular classroom or separately. Tr. at 48.  Finally, Mrs. Ford testified that Horace Mann had a speech

3

pathologist assigned to the school that would help H.K. and that the school could implement the IEP and provide H.K. with the services the IEP recommended. Tr. at 54.

B.      Testimony of the Lab School Witnesses

In stark contrast, the witnesses from the Lab School took universal exception to the IEP and considered it utterly inadequate to meet H.K.'s needs.

Donna Pavluk, the speech and language therapist at the Lab School, testified that her evaluation indicated that H.K. does not appropriately perceive the sounds of language nor does she understand the sequencing of sounds. Tr. at 67.  Ms. Pavluk further testified that, as these skills are crucial to H.K.'s reading and writing, she has a phonological disorder that is simultaneously a reading disorder and a disorder of written language. Tr at 67.  Ms. Pavluk further noted that, while H.K. has the sub-skills needed for reading, she falls apart when she does contextual reading. As a result of the disorder, she falls "way below" what is expected for her cognitive abilities and age range and her scores are far from what one would expect from a child of her cognitive ability. Tr. at 67.  According to Ms. Pavluk, H.K.'s disorder, if not cured, will render her incompetent to advance to academic competence in subjects dependent upon reading, as all subjects are. Tr. at 69.

As to the IEP, Ms. Pavluk found it incapable of providing what H.K. needs.  In Ms. Pavluk's opinion, the skills that the IEP will help H.K. achieve are kindergarten or pre-school skills and are therefore not appropriate in terms of either her test scores or the narrative portion of H.K.'s evaluation. Tr. at 75.   Ms. Pavluk does not believe that the IEP addresses H.K.'s inability to make sound-symbol relationships, nor does it reflect an objective evaluation of her test scores in terms of how she actually functions in the classroom.  It is Ms. Pavluk's conclusion that

4

H.K.'s needs can only be met by a full-time program. Tr. at 75.

Dr. Victoria Erat, a psychologist at the Lab School, testified that H.K.'s IQ score provided an inaccurate assessment of the needs created by her learning disorder; H.K.'s verbal IQ score pulled down the overall assessment of H.K.'s intelligence like the weight of an anchor. Tr. at 85. Dr. Erat insists on a broader assessment of H.K.'s skills, to specifically include an appreciation of how much H.K.'s reading and writing difficulties impact her functioning in school.  Dr. Erat therefore rejected categorizations of H.K. that used the adjectives "mild," "moderate," or "severe" to describe her disorder. Tr. at 86-87.

Dr. Erat further noted that H.K. spent an incredible amount of time in the nurse's office complaining of non-existent ailments, that she thought of herself as a failure, that she was emotionally needy and that she needed direct and individual psychiatric services from a psychologist and not mere crisis intervention. Tr. at 87-88.  Finally, as to mainstreaming H.K., Dr. Erat pointed out that two earlier efforts to mainstream H.K. had failed. Tr. at 91.

Karen Ferguson Duncan is the academic director at the Lab School.  She also testified that there was a significant discrepancy between H.K.'s IQ score and the skills she actually has. Other tests yield the same result.  She can read a certain number of words on what is called the Dolch test but when she begins to read sentences, "her decoding falls apart." Tr. at 100.  The same phenomenon occurs when she writes and, when she is asked to integrate and organize her thoughts and formulate ideas in paragraphs, H.K. "is not able to do very much at all." Tr. at 100. Ms. Duncan concluded that these difficulties, combined with H.K.'s emotional vulnerability, make H.K. a child with complicated needs. Tr. at 100.

In Ms. Duncan's view, the IEP proposed by DCPS was inadequate.  Ms. Duncan testified

that it did not provide goals and objectives in reading fluency and accuracy, which are major problems for H.K as her scores in those areas are very low.  In addition, Ms. Duncan testified that the IEP failed to state any objectives in reading for decoding, sound blending, structural analysis, or syllabication skills. Tr. at 102-103.  Given this IEP, Ms. Duncan believes that H.K.'s teacher would have a hard time knowing where to start. Tr. at 103.  Finally, Ms. Duncan concluded that the IEP is also deficient because it did not state any objectives that address: 1) spatial-temporal issues, 2) the language of math, and 3) time and money measurement skills.

Ms. Duncan obviously shared the sentiments of her colleagues at the Lab School.  H.K. is a very complicated and vulnerable child whose disabilities impact her ability to handle all aspects of the school day and the subjects H.K. encounters.  H.K. simply does not perform at the levels that are superficially indicated by her test scores; she cannot apply the skills she seems to have in a consistent and daily manner.

II.     H.K. Has Been Denied the Rights Guaranteed Her by the IDEA

This analysis of the transcript indicates that there are remarkably divergent views about H.K.'s abilities.  To DCPS, she has, at most, a moderate learning disability and should be mainstreamed into the ordinary curriculum with some additional special education and psychiatric services.  To the educators at the Lab School, she is a troubled, complicated child who, despite her test scores, is in the third grade and can hardly read and write.  That divergence among obviously experienced and dedicated educators requires that judicial review of the decision DSPS made be as careful and balanced as humanly possible.  Unfortunately, any review whatsoever is impossible because the transcript lacks the cross-examination of one of the two key witnesses called by DCPS.

DCPS dismisses the importance of that cross-examination by surmising that it would have not been significant and points out that the cross-examination of its other witness was brief. However, transcripts are prepared for the very purpose of eliminating the need to guess what witnesses said.  To be forced to base judicial review on speculation of what a witness would have said is literally to base judicial review on nothing.

Under the Administrative Procedure Act,[2] that the inability of the agency to produce the entire administrative record for review requires the vacating of the agency's action.  See Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792-93 (D.C. Cir. 1984) (holding that a court reviewing agency actions under the APA must review the *exact* record that was before the agency at the time of its decision); Fund for Animals v. Williams, 245 F. Supp. 2d 49, 55 (D.D.C. 2003) (noting that a reviewing court's consideration of information that was not before the agency allows for the risk of post hoc rationalizations); Biodiversity Legal Found. v. Norton, 180 F. Supp. 2d 7, 10 (D.D.C. 2001) ("[C]ourts have recognized that to ensure fair review of an agency action [under the APA], they 'should have before it neither more nor less information than did the agency when it made its decision . . ..  To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case.") (internal citations omitted). Thus, in this case, DCPS's inability to produce the entire record requires the vacating of the hearing officer's decision.

Furthermore, Congress has afforded the parents of a learning disabled child the right to either an electronic recording or a verbatim transcription of the hearing that was held upon a

---

[2] Review in this case is under the IDEA itself but the interpretation of the APA is persuasive since the court's function is the same.

parent's objection to the IEP. 20 U.S.C. § 1415(h)(3).  The first principle of statutory construction is that when a court is "construing a statute we are obliged to give effect, if possible, to every word Congress used." Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979); Qi-Zhuo v. Meissner, 70 F.3d 136, 139 (D.C. Cir. 1995) (holding that "all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage.")

The Latin word "verbatim" means word for word. Oxford English Dictionary   While it would be an absurd construction of the statute to require the transcription to include the hearing officer's announcing a lunch break, it surely is a fair construction of the statute to find that it is violated by the recording's failure to capture the entire cross-examination of a witness.

The parties analogize this situation to the loss of transcript in a criminal case and DCPS cites to those cases that hold that the loss of a portion of the transcript does not warrant reversal of the conviction if 1) the missing proceedings can be adequately reconstructed or 2) the reviewing court is convinced that the loss is harmless.  See e.g. United States v. Winstead, 74 F.3d 1313, 1321-22 (D.C. Cir. 1996); United States v. Carrazana, 70 F.3d 1339, 1342-44 (D.C. Cir. 1995).  It is the law of this Circuit, however, that exceptions to the requirement of the Court Reporters Act[3] that all proceedings be transcribed verbatim are to be narrowly construed.  The loss of a "complete and accurate" transcript may warrant reversal when, for example, it is impossible to reconstruct accurately what transpired and the loss is significant in the context of the entire trial and its appellate review. United States v. Workcuff, 422 F.2d 700 (D.C. Cir. 1970).  While that rule must be tempered with common sense, no court worthy of the name would refuse to reverse a conviction, no matter the consequences, if it was impossible to perform

---

[3] 28 U.S.C. § 753(b)

an effective and thorough review of the pertinent record.  That is the situation currently before us.

As I noted above, we have lost the cross-examination of one of the two witnesses who testified

for the DCPS and the only one who did a psycho-educational analysis of H.K. for the DCPS.

Any claim that her testimony was not that significant is belied by the fact that the DCPS called

her.  In my view, the loss of her cross examination is at least as significant as the loss

encountered in the <u>Workcuff</u> case.  Hence, if the word "verbatim" in the IDEA were to be

construed as that word has been construed in the interpretation of the Court Reporters Act, I still

believe that H.K.'s rights were violated.

## CONCLUSION

I therefore conclude that H.K. and her mother were denied one of the procedural rights

guaranteed them. The Supreme Court has indicated that:

> When the elaborate and highly specific procedural safeguards
> embodied in § 1415 are contrasted with the general and somewhat
> imprecise substantive admonitions contained in the Act [i.e.
> IDEA], we think that the importance Congress attached to these
> procedural safeguards cannot be gainsaid.   It seems to us no
> exaggeration to say that Congress placed every bit as much
> emphasis upon compliance with procedures giving parents and
> guardians a large measure of participation at every stage of the
> administrative process, see, *e.g.*, §§ 1415(a)-(d), as it did upon the
> measurement of the resulting IEP against a substantive standard.

Bd. of Educ. of the Hendrick Hudson Cen. Sch. Dist. v. Rowley, 458 U.S. 176, 205-06 (1982).

Hence, a violation of the procedural safeguards guaranteed by IDEA compels the

conclusion that the child has been denied a free and appropriate public education if that violation

has done substantive harm. Schoenbach v. District of Columbia, 309 F. Supp. 2d 71, 78 (D.D.C.

2004). As I have concluded, H.K. and her mother have been denied the safeguard of judicial

review of the DCPS's decision based on a verbatim transcript.  I therefore conclude that DCPS must reimburse H.K.'s mother for the costs she incurred in enrolling H.K. in the 2003-2004 and the 2004-2005 school years at the Lab School.  I so recommend.

Finally, I should note that I make this recommendation for one additional reason: to prevent such a waste of time and money from occurring again.  At a time when robotic machines are being sent from this planet to another, it is surely not too much to ask that DCPS, to whom is committed the profound responsibility to educate the children of this community, find someone who can turn a tape recorder on and off.

**Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140 (1985).**

_____
JOHN M. FACCIOLA

Dated:                                    UNITED STATES MAGISTRATE